IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Criminal No. |
| ) | 05-MJ-00635-AK-1 |
| ) | |
| v. ) | Count One: 18 U.S.C. § 201(c) |
| ) | (Unlawful Gratuity) |
| ) | Count Two: 18 U.S.C. § 922(o) |
| MICHAEL B. WHEELER, ) | (Possession of a Machine Gun) |
| ) | |
| Defendant. ) | |

**FACTUAL BASIS FOR PLEA**

If this case were to go to trial, the United States of America, by and through the undersigned attorneys of the United States Department of Justice, Criminal Division, Public Integrity Section and Asset Forfeiture and Money Laundering Section, and the Defendant, **MICHAEL B. WHEELER**, personally and through his undersigned counsel, hereby stipulate that the government could prove the following facts beyond a reasonable doubt, pursuant to United States Sentencing Guidelines § 6A1.1 and Rule 32(C)(1) of the Federal Rules of Criminal Procedure:

That beginning in or about December 2003, and continuing until approximately October 2004, in Al-Hillah, Iraq and elsewhere:

1. Defendant **WHEELER** was a Lieutenant Colonel in the United States Army Reserve, a Department of Defense ("DOD") component. During relevant times, he was on active duty assigned to the CPA-South Central Region ("CPA-SC") in Al-Hillah, Iraq,

reconstruction of Iraq which involved recommending the expenditure of CPA funds for those projects, and ensuring that contracts had been satisfactorily performed and that payment had been made in connection with the contracts.

2. On May 8, 2003, the United States and the United Kingdom presented a joint letter to the United Nations stating that they "and Coalition partners, acting under existing command and control arrangements through the Commander of Coalition Forces, have created the Coalition Provisional Authority [CPA], which includes the Office of Reconstruction and Humanitarian Assistance [ORHA], to exercise powers of government temporarily, and, as necessary, especially to provide security, to allow the delivery of humanitarian aid, and to eliminate weapons of mass destruction." The President of the United States appointed a United States Ambassador to serve as the Administrator of the CPA and thus the civil governing authority of Iraq but who remained subject to the President.

3. In 2003, Congress appropriated $698 million in initial funding to the CPA for its daily operating budget as part of the Emergency Wartime Supplemental Appropriations Act. Thereafter, the CPA conducted its operations and awarded contracts for projects intended to promote Iraq's reconstruction from several funding sources, including over $24.1 billion in funds appropriated in 2003-2004 by Congress from the General Funds of

the United States as well as $2.1 billion in repatriated Iraqi funds that were confiscated by the United States during the Gulf War in 1990. The United States deposited $210 million of the repatriated funds into a CPA account known as the Development Fund for Iraq ("DFI"), which, in addition to the United States' deposits, also included Iraqi funds derived from oil sales.

4. The CPA was primarily staffed by DOD employees, including civilians and members of the military forces detailed to the CPA, as well as DOD contractors and subcontractors, who were responsible for the management, accounting, and expenditure of all of the aforementioned funds.

5. In order to enter into contracts for the rebuilding of Iraq, the CPA used DOD contracting forms and procedures as well as creating CPA-specific contracting forms and procedures. The CPA promulgated its procedures in the CPA Contracting Memorandum which referenced and incorporated the competition, transparency and accountability standards applicable to federally-funded DOD contracts.

6. CPA contracting rules prohibited the use of appropriated or DFI funds to purchase weapons.

7. Robert J. Stein, Jr. ("Stein") was a DOD contract employee, who served in various positions at the CPA-SC including Comptroller and funding officer and was assigned to the United States Embassy in Al-Hillah, Iraq. In his official capacity,

Stein and others controlled the expenditure of over $82 million dollars in funds, including appropriated and DFI funds that were to be used for the payment of contract services rendered in Al-Hillah, Iraq for the rebuilding of Iraq.

8.  Philip Bloom ("Bloom") is a United States citizen who operated and controlled construction and service companies in Iraq and Romania that did business with the CPA-SC in Al Hillah, Iraq.

9.  Officer One is an officer in the United States Army Reserve. During relevant times, she served on active duty and was assigned to the CPA-SC in Al-Hillah, Iraq, serving as Deputy Comptroller to Stein and, in his absence, as acting Comptroller for the CPA-SC.

**COUNT ONE - 18 U.S.C. § 201(c)**

10. In early 2004, Defendant **WHEELER** submitted numerous CPA funding requests for construction work to be performed at the Regional Tribal Democracy Center in Al-Hillah, Iraq and a public library in Karbala, Iraq, to be paid to Bloom. Thereafter, Defendant **WHEELER** signed numerous Certificates of Completion certifying that the work on these CPA-SC contracts were "satisfactorily completed" and that Bloom should be paid. The total value of the funding requests submitted by Defendant **WHEELER** for contracts payable to Bloom was at least $1,700,000.

11. On or about January 7, 2004, because of Defendant **WHEELER**'s official work getting Bloom awarded contracts and paid by the CPA-SC, Bloom sent an e-mail to Defendant **WHEELER** informing him that he would provide Defendant **WHEELER** with bottles of liquor. Thereafter, he delivered the liquor to Defendant **WHEELER**.

12. On or about January 14, 2004, because of Defendant **WHEELER**'s official work getting Bloom awarded contracts and paid by the CPA-SC, Bloom sent an e-mail to Defendant **WHEELER** informing him that he had additional liquor for Defendant **WHEELER** and that he would deliver the liquor to Defendant **WHEELER** himself. Thereafter, he delivered the liquor to Defendant **WHEELER**.

13. On or about January 26, 2004, Bloom sent an e-mail containing a bid proposal to Defendant **WHEELER**, who responded by informing Bloom that the bid had to be in the name of one of Bloom's other companies in order for Defendant **WHEELER** to award the contract to Bloom.

14. On or about July 2, 2004, because of Defendant **WHEELER**'s official work getting Bloom awarded contracts and paid by the CPA-SC, Defendant **WHEELER** traveled to the United States from Iraq using business class airline tickets that had been paid

for by Bloom. Officer One traveled with Defendant **WHEELER** on a business class airline ticket purchased by Bloom.

### COUNT TWO - 18 U.S.C. § 922(o)

15. On or about January 26, 2004, Stein signed a DOD Standard Form 1449 contract with a U.S. arms manufacturer based in Sterling, Virginia that provided that the CPA, using appropriated U.S. funds, would purchase the following weapons that were delivered to Fort Bragg, North Carolina, including:

   1. four grenade launchers;
   2. twenty fully automatic submachine guns;
   3. twelve .308 caliber machine guns;
   4. twelve .45 caliber pistols; and
   5. four .45 caliber silencers.

16. In or about 2004, at the direction of Stein, Bloom wire transferred at least $311,168 from his bank accounts in Germany and Iraq to certain arms manufacturers' accounts in Illinois, Minnesota and Virginia.

17. On or about July 7, 2004, at the direction of Stein, Defendant **WHEELER** obtained the weapons at Ft. Bragg, North Carolina, and transported them from Ft. Bragg to a hotel in the Fayetteville, North Carolina area.

18. On or about July 8, 2004, Defendant **WHEELER** e-mailed Bloom inquiring about the whereabouts of Stein in an attempt to learn what Stein wanted done with the weapons.

19. On or about July 10, 2004, Defendant **WHEELER**, Stein, and Officer One transported the weapons from Defendant **WHEELER**'s hotel room to Stein's garage in Hope Mills, North Carolina, where Defendant **WHEELER** accepted three .45 caliber pistols, two .308 caliber machine guns and a silencer for personal use, and transported them from North Carolina to Wisconsin.

20. On or about November 30, 2005, in Amherst Junction, Wisconsin, and elsewhere Defendant **WHEELER** did knowingly possess and transfer machine guns, including two .308 caliber SA 58 assault weapons, Serial Numbers DS 23724 and DS 23783.

21. Defendant WHEELER knew and was aware of the essential characteristics of these firearms which made them "machine guns."

DATED: July 26, 2006, at Washington, DC.

FOR THE DEFENDANT

MICHAEL B. WHEELER
Defendant

Bruce J. Rosen, Esq.
James Wilson Plaza,
Suite 1201
131 W. Wilson Str.
Madison, WI 58703
(608) 255-4501

FOR THE UNITED STATES

Brenda Morris, Acting Chief
Public Integrity Section

By: James A. Crowell IV
Ann C. Brickley
Trial Attorneys
Public Integrity Section

By: Patrick T. Murphy
Mark J. Yost

Trial Attorneys
Asset Forfeiture and Money
     Laundering Section

United States Department of Justice
Criminal Division
1400 New York Ave., NW
Washington, DC 20005
(202) 514-1412
James.Crowell@usdoj.gov
Ann.Brickley@usdoj.gov
Patrick.Murphy@usdoj.gov
Mark.Yost@usdoj.gov